Estate of George A. McDevitt, Deceased, Estelle L. McDevitt, Temporary Administratrix v. Commissioner. Estate of George A. McDevitt, Deceased, Estelle L. McDevitt, Temporary Administratrix, and Estelle L. McDevitt, Individually v. Commissioner.
Estate of George A. McDevitt v. Commissioner
Docket Nos. 34253, 34254, 34255.
United States Tax Court
1953 Tax Ct. Memo LEXIS 387; 12 T.C.M. (CCH) 57; T.C.M. (RIA) 53032; January 30, 1953
Joseph Lorenz, Esq., and George D. Webster, Esq., for the petitioners. Robert Margolis, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The respondent determined deficiencies in the income tax of George A. McDevitt for the calendar years 1940 and 1941 in the amounts of $2,129.96 and $11,311.30, respectively, and in the income and victory tax of George A. McDevitt and Estelle L. McDevitt for the calendar year 1943 in the amount of $815.78. [1] He also determined that George A. McDevitt was liable as transferee of the assets of the George A. McDevitt Company, Inc. for the following deficiencies in income and excess profits taxes, and for 25 per cent addition to tax for 1940 for failure to file an excess profits tax return: Income Tax
Year
Deficiency
1940
$2,613.97
1941
4,244.85
1942
1,440.72
Total
$8,299.54
*388 Excess Profits Tax
Addition
Year
Deficiency
to Tax
1940
$2,301.87
$575.47
In his Reply to Answer of Respondent filed in Docket No. 34254, George A. McDevitt conceded that he is liable as transferee for any taxes due from George A. McDevitt Company, Inc., but denied that any taxes are due from that corporation for any year. Subsequent to the trial George A. McDevitt died, and motions were filed by the attorney for his estate asking that "Estelle L. McDevitt, Temporary Administratrix of the Estate of George A. McDevitt, deceased" be substituted in the place of decedent in each proceeding. Orders were issued under date of November 13, 1952, granting the requested substitution. The sole question is whether payments of $2,000 per month, made to James A. Coveney during the years 1940 to 1942, inclusive, by George A. McDevitt Company, a partnership, and George A. McDevitt Company, Inc., are deductible under Section 23 (a) of the Internal Revenue Code as compensation for services. At the trial the petitioners in Docket No. 34255 *389 abandoned an issue raised in that proceeding that the assessment was barred by the statute of limitations. Findings of Fact The income tax returns of George A. McDevitt for the years 1940 and 1941, of the George A. McDevitt Company, Inc. [2] for the years 1940, 1941 and 1942, and of George A. and Estelle L. McDevitt, husband and wife, for the year 1943, were filed with the collector of internal revenue for the second district of New York. The George A. McDevitt Company was engaged in the business of soliciting national advertising for newspapers on a commission basis. George A. McDevitt, founder of the business, came to New York in 1915, representing at that time the Philadelphia Record. James A. Coveney became associated with the McDevitt Company in 1919, when that company acquired the representation of the Boston Herald Traveler. Coveney's duties at the time of his employment by the McDevitt Company, which was then a proprietorship, were to solicit advertising for the *390 Herald. In the years subsequent to 1919, the following newspapers were added to the list of McDevitt Company clients: The Cleveland News, St. Louis Star, Camden Courier Express, New York Post, Chicago Daily News, Washington Times Herald, Scranton Times, Manchester Union Leader, and New Orleans Item. In 1922, upon the acquisition of the representation of the Cleveland News, a Chicago office was opened by the McDevitt Company, and Joseph McOwen and Henry Slamin joined the organization. Coveney, Slamin and McOwen were offered and each paid $3,900 for a share of the Chicago office; together with McDevitt, each partner held a 25 per cent interest. In addition to this office, the McDevitt Company subsequently opened branch offices in Detroit and Philadelphia. Coveney, being one of the ablest salesmen in the field, became very active in the McDevitt organization. He became very close to the publishers. He secured for McDevitt Company the representation of the Washington Times Herald, and contributed greatly to securing the representation of a large portion of the other newspapers. His services were of such value that from time to time McDevitt gave him an increasing interest in the business *391 until McDevitt's and Coveney's interests were the same. Each held 50 per cent of the New York and 25 per cent of the Chicago partnership of the McDevitt Company. In 1927, McDevitt and Coveney with the aid of a third party established an outside business, the nature of which was said to be a trade secret, and it was identified to this Court merely as the "X" Company. Each held a one-third interest in that company. Charles Birmingham, a Massachusetts lawyer and a mutual friend of McDevitt and Coveney, became the attorney for the "X" Company. The earnings of the McDevitt Company and the drawings of its partners during the period from 1930 to 1937 were substantial, Coveney and McDevitt each annually drawing an average of $45,000 during the years 1935 to 1938, inclusive. However, during the latter part of 1937 and during 1938, the McDevitt organization experienced a recession in business, advertising dropping off markedly, necessitating cuts in salaries and reduced profits to the partners. During this same period discussions were had among the partners and employees as to the means of replacing the lost volume of business so that the company would not have to cut its staff. After *392 exhausting varied suggestions by the partners, it was decided that the company would branch into the shopping newspaper field. This was a serious decision since it meant that the company would have two competing media in its offices at the same time, the regular newspapers it had represented for many years and the shopping newspapers, direct and potent competitors for the same advertising. In line with this decision the company engaged the services of A. H. Kenyon to make a preliminary survey of the United States relative to the shopping newspaper situation. Kenyon started his trip in November, 1938, keeping in constant touch with the company and receiving his instructions from Coveney and McDevitt, but at no time divulging for whom he was acting. Kenyon returned to New York in February 1939, with the results of his survey which indicated that many of the shopping newspapers were interested in having representation in the national advertising field. His trip cost the McDevitt Company approximately $5,700, a portion of which was borne by Coveney as a partner. Immediately after Kenyon's return discussions were had among the partners as to the advisability of establishing a separate *393 organization to handle shopping news so that the regular newspapers which were the heart of the McDevitt Company business would not be offended or lost as clients. A plan to separate the two organizations was agreed upon. But Coveney approached E. W. Preston, publisher of the Boston Herald Traveler, and obtained his approval to having both types of papers in the McDevitt Company together, so long as they did not represent shopping news in cities where they had regular newspaper clients. However, Preston subsequently had a change of heart and a return to the original plan of separation was necessitated. Pursuant to the original plan a second partnership was to be formed, in which all of the partners would have the same participation as they had in the McDevitt Company. It was agreed that the McDevitt Company would finance and staff the new organization, the effect of the arrangement being that as to the partners, there would be one organization; but as to any outsider, it would appear that there were two separate enterprises and hence the regular newspaper publishers would not be offended by the representation of shopping news publications. By this means the partners hoped to increase *394 gross volume without increasing expenditures and hold their organization together. There was a great deal of discussion as to who would head the new organization. Early in 1939, it was decided McDevitt would run the new business, but this was subsequently changed and Coveney agreed to organize the new office and move downstairs in the same building occupied by the McDevitt Company. It was further agreed that he was to take with him certain portions of the McDevitt Company staff. On March 28, 1939, Coveney wrote the various publishers advising them that he was leaving the McDevitt Company, but not informing them of the confidential arrangement whereby the two organizations were one. McDevitt signed the new company lease, ordered the furniture, planned the layout of the new downstairs office and Coveney moved down April 19, 1939. The new company was to be the James A. Coveney Company and a partnership agreement was drawn and signed by McDevitt, Coveney, McOwen and Slamin, giving each partmer the same interest in the Coveney Company as he had in the McDevitt Company. A few days after the Coveney Company offices were opened and Coveney had notified the public of his resignation from *395 the McDevitt Company, he spoke to McDevitt about the method to be employed in absorbing the McDevitt Company men into the new organization, whether it would be gradual or at one time. McDevitt, in reply, stated that he had changed his mind and would not permit these men to go down with Coveney; that the most important matter was the preservation of the McDevitt Company. Coveney, completely surprised at McDevitt's attitude, stated that if he had to continue downstairs alone, without an organization, there should be a clean break and not an ostensible separation. His situation was such that, having notified the public of his withdrawal from the McDevitt Company, he was left with no alternative but to go on with the shopping news project. He told McDevitt that he would consider selling his interest in the McDevitt Company, which at that time constituted 50 per cent of the New York and 25 per cent of the Chicago offices. [3] McDevitt said he would communicate with the Chicago partners and advise Coveney. *396 After a short period of time, Charles Birmingham, an attorney and friend of both Coveney and McDevitt, told Coveney that McDevitt would be willing to offer him $72,000 for his interest in the McDevitt Company (Chicago and New York), payable over a three-year period, but he did not want anyone held liable for the payment. Coveney was agreeable to the price but balked on the matter of liability and demanded a contract binding upon someone. Negotiations continued for a short time until Coveney decided he would sign the agreement as requested by McDevitt. On May 29, 1939, McDevitt wrote Slamin and McOwen, the Chicago partners, that the "Coveney stock is to be purchased at the rate of $2,000 a month for three years". Subsequently McDevitt told Coveney that his tax consultant had informed him that, if the contract could be drawn so that it would appear to be an employment of Coveney's services, he could deduct the payments as salary and save money and Coveney would not pay any more taxes, if he reported the payments as salary, than he would pay if they were reported as being consideration received for his partnership interest. Coveney said that if it cost him no more, he was agreeable. *397 Pursuant to this arrangement, a contract dated June 20, 1939, was drawn up by Birmingham, pursuant to McDevitt's instructions. Birmingham was not paid by either McDevitt or Coveney for drawing the contract or for handling the negotiations which preceded its execution. He performed these services as a favor to both of them. The contract read as follows: "In order that there may be a memorandum of the agreement on which you are withdrawing from membership in the George A. McDevitt Company of New York and the George A. McDevitt Company of Chicago, may we state that it is our understanding that you are assigning all your right, title, interest and ownership in these two several Companies to the continuing partners upon the consideration that you are to be employed by the two said Companies jointly for the term of three years beginning May 1, 1939 at a salary of Two Thousand Dollars per month; that the liability of the undersigned continuing partners of the George A. McDevitt Company of New York and the George A. McDevitt Company of Chicago, and of any persons who may hereafter be admitted as partners in the said Companies, upon this contract, shall be only to the extent of their interests *398 in the two said Companies, and if the partnership assets of the two said Companies are insufficient to meet their liabilities and they should cease to do business, all liability with respect to this contract shall cease, in which event you agree to save harmless from all claims and demands in respect hereto and from all rights and remedies arising herefrom the continuing partners in the said Companies and all persons who may hereafter be admitted to membership in them, and that liability under this contract shall cease for all persons who being partners now or who in the future may become partners and who during the life-time of this contract withdraw from membership in the said Companies. "If this is your understanding of the agreement upon which year are retiring from the two said Companies and transferring your ownership in them to the respective continuing partners, may we ask if you will please notify us by writing the words 'agreed to' and signing your name on the carbon copy of this letter, which is sent herewith, and returning the same to us, and upon receipt of same by us this agreement shall become effective and the transfer of your interest be complete." The contract *399 was signed by all the partners, and Coveney wrote thereon "Agreed to James A. Coveney". It was the understanding of all parties to the contract that Coveney was to take over the shopping news project, which could not be operated by the McDevitt Company because of the objections of the newspaper publishers. During the entire period of the negotiations leading up to the June 20, 1939, agreement, Coveney had no counsel while McDevitt was advised on the tax aspects of the transaction by a member of a firm of certified public accountants. Payments received by Coveney pursuant to the agreement amounted to $16,000 in 1939, $24,000 in 1940 and 1941, and $8,000 in 1942. The McDevitt Company never received any income from the shopping news project. After Kenyon's return from his survey of the shopping news publications, contracts were drafted and mailed to them for their signature. Contracts dated prior to April 19, 1939, were mailed from the McDevitt Company office, and those dated from and after April 19, 1939, from the office of the Coveney Company. The contracts were dated when they were mailed and not when they were signed. All contracts provided for compensation of twenty per cent *400 of the national advertising secured for the papers. The Coveney Company expected, but had no assurance, that the shopping news publications would sign and return the contracts. Some were never signed and returned. Only contracts mailed to shopping newspapers in the smaller cities were returned promptly. The shopping newspapers signed and returned to the Coveney Company ninety-five contracts. Twenty-nine were dated March 30 or 31, 1939; thirteen bore various dates in April, 1939; nine various dates in May, 1939; three various dates in June, 1939; and forty-one various dates subsequent to June, 1939. The Coveney Company received from the shopping newspapers, during the period of its operations in 1939, gross commissions of $5,063.81, and it sustained a net loss during that period of $29,200.11. During the period May 1 to December 31, 1939, inclusive, the McDevitt Company received gross commissions from newspapers of $158,448.54 and realized net income of $67,633.69. The gross receipts and net income reported by the McDevitt Company (Chicago and New York) in returns filed for the years 1935 to 1938, inclusive, and for the period January 1 to May 1, 1939, were as follows: Gross receipts
Net income
1935
$272,083.86
$126,947.65
1936
333,159.75
193,384.19
1937
318,738.21
154,328.10
1938
225,645.99
59,087.10
Jan. to May 1939
71,909.98
21,891.73
*401 When Coveney left the McDevitt Company, it had a good name, and approximately ten contracts with newspaper publishers, some of which had run for a long period. At that time Coveney had numerous rights under the McDevitt Company partnership contract, an interest in all accounts receivable and commissions earned but not paid, an interest in some New York Post stock owned by the company, and a credit to his capital account. The furniture supplied by the McDevitt Company prior to June 20, 1939, was returned to it by Coveney, with the exception of his desk and chair, and the Coveney Company purchased and paid for its office furnishings. The split in the McDevitt organization did not cause a rift between McDevitt and Coveney. They continued to lunch together, discuss each other's business problems and to manage and operate the "X" company of which each still owned a one-third interest. There came a time when the third partner in "X" company died and continuous and frequent conferences were had by Coveney and McDevitt. After they separated the relations between them were cordial and McDevitt testified that he felt that he could have called upon Coveney as a friend to assist the McDevitt *402 Company with any problem that might arise and that Coveney would render such assistance without compensation. Coveney performed no services for McDevitt or the McDevitt Company under an employment contract. However, he did certain favors for McDevitt as a friend. After the purchase of Coveney's interest, McDevitt offered to sell a 50 per cent interest in the New York company to James F. Fitzpatrick and Wm. J. Swagerman for $24,000 each, payable, however, out of their share of the earnings of the company. The offer was accepted and Fitzpatrick and Swagerman each received a 25 per cent interest in the New York company. When Coveney left the McDevitt Company, Joseph A. McOwen owned a 25 per cent interest in the McDevitt Company of Chicago. On March 2, 1940, McDevitt wrote a letter to McOwen which stated in part that "the Chicago Company will purchase your interest on the same arrangement that we made with Coveney, which would mean that you would receive, over a period of three years, in monthly payments, one-third of the amount being paid Coveney." McOwen's interest was purchased for $24,000, the same price paid to Coveney for his 25 per cent interest in the Chicago company. During *403 this entire period McDevitt was charging as an expense the payments to Coveney, one-third to Chicago and two-thirds to New York, in the same proportion as Coveney's prior interest in the two partnerships. The payments of $2,000 per month during the taxable years were made to acquire the interest of James A. Coveney in the combined McDevitt companies (New York and Chicago) and were not made to compensate him for services rendered or to be rendered or for the purpose of retaining his good will. Opinion RAUM, Judge: The question is one of fact. Were the payments of $2,000 per month made to Coveney for his interest in the McDevitt companies, or were they made to retain his good will and for his services? We have found that they were made to acquire Coveney's interest in the McDevitt companies. In reaching this conclusion we have given careful consideration to the evidence presented by the parties. Both McDevitt and Coveney testified at the trial. Their testimony as to what happened when the shopping news publication representation was transferred to the Coveney Company and Coveney gave up his interest in the McDevitt companies is conflicting. McDevitt's version of the transaction *404 was that the McDevitt companies and Coveney agreed that the latter would take the shopping news business in exchange for his interest in the McDevitt companies, and that the payments of $2,000 per month were, and were intended to be, compensation for his services in the future. Coveney's version was that the payments were for his interest in the McDevitt companies and that the provision of the agreement of June 20, 1939, indicating that he was to be employed by those companies for a period of three years at a salary of $2,000 per month, was inserted with his permission so that the contract would appear to be a contract of employment and McDevitt could get the benefit of deductions for salary. Coveney testified that he consented to the contract being drawn up as an employment contract after he was informed that McDevitt's tax consultant had expressed the opinion that his tax liability would be the same whether he reported the payments as salary or as consideration for the sale of his interest in the McDevitt companies. The evidence convinces us that Coveney's version of the transaction is accurate. The McDevitt companies had an established business, a national reputation, an average *405 gross income for the years 1935 to 1938, inclusive, of approximately $287,000, and an average net income for those years of approximately $133,000. Coveney's average annual income from his interest in the companies was between $40,000 and $50,000. We are not convinced that he did or would exchange such a valuable partnership interest for the shopping news project, which was not a going business, had never earned any income, and which was in the development stage at the time the agreement of June 20, 1939, was executed. Neither are we convinced that the monthly payments of $2,000 were made to retain Coveney's good will and for his services. The evidence establishes that Coveney was an efficient salesman who had the confidence and respect of the newspaper publishers represented by the McDevitt companies and who had contributed heavily to the success of their business. Under these circumstances it may be assumed that McDevitt would desire to retain Coveney's good will so that he might call upon him to use his influence with some newspaper publisher if the occasion arose where he could be of some assistance to the business of the partnership. Such service might consist in Coveney's having *406 lunch or dinner with a publisher, and endeavoring to use his influence with the publisher to persuade him not to terminate the McDevitt Company's representation of that publisher's newspaper. It does not follow, however, that it was necessary to pay Coveney for any such service. In fact, McDevitt testified that his relations with Coveney were so cordial, at the time he retired from the partnership and for many months thereafter, that he would not have hesitated to ask Coveney to render some service for the McDevitt Company and that Coveney would have rendered it without compensation. We find it difficult to believe, therefore, that McDevitt would pay Coveney $72,000 for some uncertain and intangible services which could have been received without charge. At the time Coveney retired from the partnership he received the shopping news project and a promise to pay him $2,000 per month for a period of three years. He transferred to the McDevitt companies his interest therein. By that time it had been clearly established that the newspaper publishers, who were clients of the McDevitt companies, would not permit them to represent the shopping news publications. Whatever potential value *407 there may have been in the shopping news program, in which the McDevitt companies had invested $5,700 prior to the time the newspaper publishers announced their opposition to it, it had little if any value to them thereafter because all hope of representing shopping news publications had to be abandoned. This may explain why the shopping news program was not mentioned in the agreement of June 20, 1939. In any event, we are satisfied that the agreement between McDevitt and Coveney was that Coveney should receive $72,000 for his interest in the McDevitt companies and was also to receive the shopping news, and that the employment provisions were inserted in the June 20, 1939, agreement to make it appear that the payments were for Coveney's services when they were in fact payments for his partnership interest. No part of these payments was made for services rendered or to be rendered or to retain Coveney's good will and the respondent did not err in disallowing the deduction of the payments made to him during the taxable years. Decisions will be entered for the respondent. Footnotes
1. The year 1943 is involved because of the provisions of the Current Tax Payment Act of 1943.↩
2. The George A. McDevitt Company, Inc., was incorporated under the laws of the State of New York on January 2, 1940. The corporation was dissolved on December 31, 1941, and liquidated during the year 1942.↩
3. The partnership agreement executed on January 1, 1938, provided, in part, as follows: 15. Any partner may sell his share in the partnership but shall first offer such share to the other partner or partners, at a price to be named by the selling partner. If the offer shall not have been accepted within one month, then the selling partner shall be at liberty to sell his share to any other person or persons, at the same or a higher price, but shall not sell the same to any other person at a less price unless and until it shall have been offered to the other partner or partners at such less price, and such last mentioned price shall not have been accepted within one month.↩